FILED

2021 Mar-19  PM 01:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MARY BEAVERS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   5:19-cv-01773-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Mary Beavers seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's

impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525.   That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 404.1520; *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.   20 C.F.R. § 404.1520(e).   At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.   *See id.* § 404.1520(a)(4)(iv).   If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.   *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.   20

C.F.R. § 404.1520(g).   If the claimant can perform other work, the evaluator will not find the claimant disabled.   *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"   *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Id.* (citations omitted).   Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision.   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

4

## FACTUAL AND PROCEDURAL HISTORY

Ms. Beavers, age 49 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on July 1, 2015, alleging disability as of May 31, 2015.  (Tr. 46, 173).  The Commissioner denied her claim, and Beavers timely filed a request for hearing on September 22, 2016.  (Tr. 78, 92-101).  An Administrative Law Judge ("ALJ") held a hearing on June 28, 2018.  (Tr. 42-67).  The ALJ issued an opinion on October 30, 2018, denying Beavers's claim. (Tr. 18-34).

Applying the five-step sequential process, the ALJ found at step one that Beavers did not engage in substantial gainful activity after May 31, 2015, her alleged onset date. (Tr. 23).  At step two, the ALJ found Beavers had the severe impairments of cardiomyopathy with post pacemaker/defibrillator implant in 2013, obesity, anxiety, and depression.  (*Id.*).  At step three, the ALJ found that Beavers's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 25).

Next, the ALJ found that Beavers exhibited the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) [except that] she can occasionally lift and/or carry, including upward pulling of 20 pounds, and frequently lift and/or carry, including upward pulling of 10 pounds. She can sit six hours in an eight-hour workday with customary breaks. She can stand and walk six hours in an eight-hour workday with customary

breaks.   She is limited to occasionally climbing ramps, stairs, balancing, kneeling, stooping and crouching[,] but no crawling.   She cannot climb ladders or scaffolds.   She should avoid all exposure to unprotected heights, dangerous moving machinery, and vibrations.   She should avoid all exposure to extreme heat.   She can understand, remember and carry out short[,] simple instructions.   She can sustain attention and concentration to carry out the simple instructions for two hour periods, across an eight hour workday, five day workweek, with all customary breaks.

(Tr. 25).

At step four, the ALJ determined Beavers did not retain the ability to perform her past relevant work as a store manager.   (Tr. 32).   At step five, the ALJ determined Beavers could perform a significant number of other jobs in the national economy considering her age, education, work experience, and RFC.   (Tr. 32-33).   Accordingly, the ALJ determined that Beavers has not suffered a disability, as defined by the Social Security Act, since May 31, 2015.   (Tr. 33).

Beavers timely requested review of the ALJ's decision.   (Tr. 164-67).   On July 3, 2019, the Appeals Council granted Beavers's request for review because the ALJ improperly calculated Beavers's date last insured.   (Tr. 168-72).   Therewith, on September 4, 2019, the Appeals Council issued an unfavorable decision, agreeing that Beavers did not meet the requirements for entitlement to disability benefits.   (Tr. 1-7). The Appeals Council adopted the ALJ's findings at steps one, two, three, and four of the sequential evaluation process, including the ALJ's residual functional capacity finding.   However, at step five, the Appeals Council clarified that Beavers "meets the

insured status requirements of the Social Security Act through December 31, 2020." (Tr. 4-5).

On October 31, 2019, Beavers filed her complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Beavers argues that the ALJ improperly considered the opinions of her treating physician and improperly evaluated her complaints of subjective symptoms.   For the reasons discussed below, the undersigned concludes neither of the contentions warrants reversal.

## I.    The ALJ Properly Considered the Treating Physician's Opinion

Beavers argues the ALJ improperly considered the opinions of Dr. Ronald Calhoun, her primary care physician.[2]   As discussed below, the ALJ properly relied upon the remainder of the record, including Dr. Calhoun's own treatment notes and the records of other medical providers, to reject Dr. Calhoun's assessments.

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Good cause exists when: (1) the evidence did not bolster the treating physician's

---

[2] As the Appeals Council adopted the ALJ's decision in all respects other than the date last insured, any reference in this opinion to the ALJ's decision also encompasses the Appeals Council's decision.

opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.* (citing *Lewis,* 125 F.3d at 1440). An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.* (citing *Lewis,* 125 F.3d at 1440). An ALJ does not commit reversible error when (1) he articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d 1208, 1212-13 (11th Cir. 2005) (*per curiam*).

To determine the weight given to any medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional. 20 C.F.R. §404.1527(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff and opinions that are supported by medical signs and findings and are consistent with the overall "record as a whole"). The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

Dr. Ronald Calhoun submitted a "To Whom it May Concern" letter on November 5, 2015.   He stated:

> This letter is in support of Ms. Beavers['s] application for disability. She has been a patient of mine since January 2007.  She suffers from several chronic medical conditions that in my opinion preclude her from any type of gainful employment.   Specifically[,] she has a severe heart condition which causes palpitations and tachycardia.   She had to have a permanent pacemaker and defibrillator placed because of this disease. She also suffers from chronic pain in her lower back [f]or which she must take strong pain medications on a daily basis.   It is my medical opinion that she is fully disabled[,] and I urge you to grant her request for disability.

(Tr. 801).

He submitted a second letter on July 25, 2018, stating:

> Mary Beavers has been a patient of mine for many years and is treated for several chronic conditions including chronic pain, degenerative disk disease, diabetes, anxiety, major depressive disorder, morbid obesity and congestive heart failure.   She also suffers from ventricular tachycardia for which she has had ablation therapy to prevent these episodes.   Regardless of therapy for her heart condition[,] she continues to experience significant symptoms of tachycardia or "racing heart" on nearly a daily basis.   These symptoms continue despite medical therapy. Her symptoms occur at random and can occur with any activity.   She experiences these symptoms of tachycardia while sitting, lying down, standing, with just about anything she does.   The timing and duration are random and unpredictable.   Because of these symptoms[,] she has had a pace maker implanted in her heart to try to control these events.   Because of her heart condition as well as the other serious chronic diseases she suffers from[,] it is my opinion that she is unable to perform any type of work now or in the future.
>
> I find her to be a very reliable and trustworthy person and does not exaggerate her symptoms for secondary gain.   I support her application for disability and urge you to grant this request.

(Tr. 1013).

The ALJ did not explicitly address Dr. Calhoun's 2015 statement.  The ALJ afforded Dr. Calhoun's 2018 statement no special significance, as it constituted "an assessment of [her] ability to perform work, which is an opinion of an issue reserved to the Commissioner."  (Tr. 29).  The ALJ reasoned that the medical record did not support Dr. Calhoun's opinions, as "all records from other doctor's [*sic*] note the claimant with a normal physical examination with her complaining of a racing heart but the medical sources found no problems[,] only that she appeared anxious."  (Tr. 29). The ALJ also stated that Dr. Calhoun "is not a heart specialist but the family doctor." (*Id.*).

Furthermore, he observed

> that the relationship between a patient and a treating physician is a special one, where the physician's desire is to relieve his patient's symptoms as they are described to him.  Dr. Calhoun's "opinions," which were solicited by the claimant and her representative[,] were more subjective, or as one medical expert put it, "the treating physician speaks from the heart" when acquiescing to his pat[i]ent's requests.  His treating notes, however, are presumed to be the contemporaneous documentation of both the subjective statements of the patient, and of the objective findings and test results obtained by the physician.  When both forms of communication are present, more weight must be given to the latter as being the true evaluation of the claimant's condition.

(Tr. 29-30).

The ALJ rightfully rejected Dr. Calhoun's statement that Beavers cannot work, as that statement constituted an administrative finding instead of a medical opinion.

10

> According to 20 C.F.R. § 404.1527(d), the determination of whether an individual is disabled is reserved to the Commissioner, and no special significance will be given to an opinion on issues reserved to the Commissioner. Section (d)(2) provides that although the Commissioner will consider opinions from medical sources on issues such as the RFC and the application of vocational factors, the final responsibility for deciding those issues is reserved to the Commissioner.

*Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017). That is, "the task of determining a claimant's . . . ability to work is within the province of the ALJ, not of doctors." *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010).

Pursuant to Social Security regulations, the ALJ also properly considered Dr. Calhoun's lack of a cardiology specialization when determining how much weight to afford Dr. Calhoun's opinions about Beavers's heart condition. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

Moreover, substantial evidence supports the ALJ's conclusion that Dr. Calhoun's opinion lacks support from Dr. Calhoun's own records and from other providers' treatment records. On June 11, 2015, Beavers's first visit to Dr. Calhoun after her alleged disability onset date, she reported back pain radiating into her left leg. (Tr. 441). On June 22, 2015, she reported experiencing "spells" with her heart and awaited a follow-up phone call from her cardiac specialist. She again reported constant pain in her lower back that radiated into her left leg, especially with driving, sitting, and

standing.   Dr. Calhoun prescribed pain medications.   (Tr. 440).   On August 20, 2015, Beavers reported continued pain but improved function.   (Tr. 291).   On September 30, 2015, she reported no new problems, no decline in function, adequate pain relief from her medications, and improved daily living activities.   (Tr. 290).   On October 28, 2015, she reported adequate pain relief, ability to meet her functional goals, and improved daily activities.   (Tr. 289).   On December 1, 2015, she reported no new problems, no decline in function, adequate pain relief, ability to meet her functional goals, improved daily activities, and decreased medication side effects.   (Tr. 288).   On December 29, 2015, she reported bad pain on her right side and some in her lower back.   (Tr. 287).

On January 26, 2016, Beavers reported "doing good" with no new problems. (Tr. 282, 821, 874, 967).   On February 26, 2016, she reported "doing pretty good," with no new problems and no decline in function.   Her medication adequately controlled her pain with no adverse side effects, and she could meet her functional goals.   (Tr. 281, 819, 875, 968).   On March 25, 2016, she again reported "doing good" with no new problems, and Dr. Calhoun characterized her chronic low back pain as "stable."   (Tr. 280, 817, 876, 969).   On April 21, 2016, she reported feeling "ok," with no new problems and no decline in function.   Dr. Calhoun characterized her lower back pain as "stable."   Beavers experienced adequate pain relief from her medications, and she could meet her functional goals with improved daily activities.   (Tr. 279, 815,

877, 970).   On May 24, 2016, she reported "doing good," with no new problems and no decline in function.   Dr. Calhoun again characterized her chronic pain as "stable." (Tr. 278, 813, 878, 971).   On August 22, 2016, she reported feeling "pretty good" and experienced no new problems or decline in function. (Tr. 360, 810, 881, 973).   On December 15, 2016, she reported chronic pain, but Dr. Calhoun characterized the pain as "stable," Beavers reported adequate relief from her pain medications, and she could meet her functional goals.   (Tr. 806, 868, 882, 974).

On March 9, 2017, Beavers reported "doing better," and Dr. Calhoun characterized her low back pain as "stable."   (Tr. 804, 884, 976).   On May 31, 2017, she complained of leg and abdominal cramps, fatigue, bad dreams, back pain, increased depression, and racing heart rate.   Dr. Calhoun added medications for muscle spasms and depression.   (Tr. 889, 978).   On August 17, 2017, Beavers complained of increased pain in her lower back and groin.   Dr. Calhoun assessed her with a urinary tract infection, but her characterized her chronic pain as stable and her muscle spasms as "better."   (Tr. 891, 980).   On November 16, 2017, Beavers reported "doing good," with no new problems, and Dr. Calhoun characterized her chronic pain as stable.   (Tr. 981).   On December 14, 2017, she reported increased anxiety and nausea, but she did not report any symptoms related to her chronic pain, and Dr. Calhoun characterized that condition as stable.   (Tr. 982).

13

On January 18, 2018, Beavers presented with acute conditions and did not complain of her chronic problems. (Tr. 983). On March 15, 2018, she said she felt "ok" with regard to her pain, and she manifested no new problems. Dr. Calhoun characterized her chronic pain as stable. (Tr. 984). On April 12, 2018, she reported increased depression, but her pain felt "pretty good." Dr. Calhoun characterized her chronic pain and anxiety both as stable. (Tr. 986).

Beavers also received treatment for her cardiac condition from the Heart Center. On December 4, 2012, approximately two and a half years prior to her alleged onset date, Beavers underwent a cardiac ablation to treat tachycardia. (Tr. 383, 416). On April 25, 2013, still more than two years prior to her onset date, doctors implanted a pacemaker to control her heart rhythm. (Tr. 373, 531). On June 19, 2015, tests revealed elevated heart rate (Tr. 738-39, 749), but other evaluations revealed the pacemaker functioned appropriately, and the device detected no major arrythmias, even though Beavers continued to report some racing heart rate symptoms. (Tr. 366 (8/15/13); Tr. 364 (12/16/13); Tr. 361 (4/14/14); Tr. 740-41, 750 (3/11/15); Tr. 735 (9/25/15); Tr. 284-85, 879, 897-98, 972 (7/14/16); Tr. 883, 899-901, 912-14, 975 (2/8/17); Tr. 920-22 (5/22/17); Tr. 923-25 (9/26/17); Tr. 926-28 (1/2/18); Tr. 929-31, 985 (4/5/18)). On August 24, 2015, she underwent a catherization, which resulted in no complications and documented normal heart function. (Tr. 357, 747).

During evaluations at the Heart Center on March 11, 2015, June 29, 2015, and September 25, 2015, Beavers reported no active pain or limitations on mobility and ambulation, and she displayed normal range of motion.   (Tr. 735-36, 740-46).   On February 9, 2017, she complained of a daily, racing heart rate, but she denied chest pain, palpitations, shortness of breath, dizziness, or syncope.   She also complained of muscle aches and weakness.   Her pacemaker did not record any sustained arrhythmias, although she did experience a few episodes of elevated heart rate.   The provider adjusted her medications and recommended a hormone check by her gynecologist. (Tr. 902-06, 915-19).

Beavers also received routine treatment from Dr. Susan Copley at Northeast Alabama Health Services.   (Tr. 829-67, 935-64).   On August 23 and September 29, 2016, she reported no musculoskeletal pain and no chest pain, discomfort, or palpitations.   Physical examinations revealed normal results, including for her heart rate, heart rhythm, gait, and stance.   (Tr. 831-32, 837-38).   On November 22, 2016, she reported pain in her fingers, elbows, and knees, but no chest pain, discomfort, or palpitations.   Physical examination findings included normal heart rate and rhythm, normal gait, and normal stance.   (Tr. 857-58).   On March 27, 2017, when Beavers presented for a mammogram, she reported no musculoskeletal or chest pain.   The clinical examination revealed normal findings.   (Tr. 863-64).   On September 1, 2017, she reported pain in her neck and head from a motor vehicle accident on August 21.

15

She reported no chest pain, discomfort, or palpitations, and her cardiovascular and musculoskeletal examinations produced normal results.  (Tr. 936-40).   On September 13, 2017, Beavers reported to review her lab results, and she experienced no new notable symptoms.  (Tr. 941-47).   On October 20, 2017, she reported no chest pain or discomfort, no palpitations, no elevated heart rate, and no localized joint pain or stiffness.    The   physical   examination   produced   normal   cardiovascular   and musculoskeletal results. (Tr. 948-53).   On April 4, 2018, she reported no chest pain or discomfort, and the physical examination produced normal findings.   (Tr. 954-59).

The ALJ justifiability concluded that these records contradict Dr. Calhoun's assessment of disabling limitations, as the records reflect routine, successful treatment for chronic conditions, and limited complaints of pain, elevated heart rate, or other limitations from Beavers's conditions.   Thus, substantial evidence supported the ALJ's decision to reject Dr. Calhoun's opinions.

Beavers's other arguments regarding the ALJ's treatment of Dr. Calhoun's opinions also lack merit.   Beavers argues the ALJ erred by failing to consider Dr. Calhoun's November 5, 2015, letter, and, indeed, the ALJ's decision mentions only the July 25, 2018, letter, not the November 5, 2015, letter.   However, that omission constitutes, at most, harmless error.   Both of Dr. Calhoun's letters impermissibly assume the administrative function of assessing Beavers's ability to work.   Both letters focus upon Beavers's heart condition, for which Dr. Calhoun did not provide direct

treatment, but both discuss other conditions as well, including chronic pain. Accordingly, for the same reasons the ALJ properly considered Dr. Calhoun's 2018 letter, he properly considered the 2015 letter as well.

Finally, Beavers argues the ALJ's discussion of treating physicians who "speak from the heart" "simply lacks any merit[,] is based upon mere speculation[,] and is not supported by substantial evidence." (Doc. 12, at 8).   The court agrees the ALJ's observations bear little probative value, but the regulations do permit the ALJ to consider the nature of the relationship between a physician and patient when assessing the weight to afford the physician's opinions.   20 C.F.R. § 404.1527(c)(2).   Moreover, the ALJ did not outright reject Dr. Calhoun's opinions because of their inherent potential for subjectivity.   Rather, he also considered Dr. Calhoun's treatment notes, and he gave the notes more weight than Dr. Calhoun's letter, because the notes "are presumed to be the contemporaneous documentation of both the subjective statements of the patient, and of the objective findings and test results obtained by the physician," and, as such, they represent "the true evaluation of the claimant's condition."   (Tr. 29-30).   That evaluation comported with the regulatory requirements, *see* 20 C.F.R. § 404.1527(c)(3)-(4), and, as discussed, substantial evidence supports the ALJ's finding that Dr. Calhoun's treatment records and the other medical evidence failed to support Dr. Calhoun's opinions.

In summary, the ALJ (and, by adoption, the Appeals Council) did not err in evaluating Dr. Calhoun's opinions.

## II. The ALJ Properly Considered Beavers's Subjective Complaints and Resulting Limitations

Beavers also argues that the ALJ improperly considered her subjective complaints and resulting limitations.  The court concludes the ALJ properly applied the Eleventh Circuit's standard for evaluating subjective limitations, and substantial evidence supported his decision.

> "To establish disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing: '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'"

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (*per curiam*)).  A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminated the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarified that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL

18

1119029, *7 (Mar. 16, 2016).   An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *9; *see also Wilson*, 284 F.3d at 1225 (if an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Beavers testified during the administrative hearing that doctors implanted a pacemaker because her heart rate would elevate to the point that she felt dizzy, almost passed out, felt sick to her stomach, sweated, experienced anxiety, and needed to lie down on the floor.   Even with the pacemaker, her heart rate elevates above 180 beats per minute an average of two or three times a day, regardless of whether she sits, stands, sleeps, or exerts herself.   During such episodes, she experiences dizziness, shortness of breath, and anxiety for approximately one hour, and she must lie in the fetal position until the symptoms dissipate.   She also experiences pain in her hips and lower backside,

for which she takes hydrocodone and Norco.   The medications cause her to experience fatigue and dizziness.

She serves as the primary caretaker for her nine-year-old son, who rides the bus to and from school.   She attended her son's awards day activity at school, but she does not take him to sporting events.   She does not perform chores, and she attempts to cook, but the family mostly eats meals others cook for them.   She can dress herself, including fastening buttons and tying shoes.   She drives occasionally to shop for supplies like toilet paper and paper towels. (Tr. 47-49, 54-62).

The ALJ accurately summarized Beavers's hearing testimony.   (Tr. 26).   He appropriately applied the Eleventh Circuit's pain standard, finding Beavers suffered medically determinable impairments that could reasonably cause her alleged symptoms; yet, he determined her statements regarding the intensity, persistence, and limiting effects of those impairments did not comport with the medical and other evidence. (*Id.*).

The ALJ also articulated sufficient reasons to support his finding.   He reasoned that although Beavers complained of elevated heart rate and palpitations after receiving her pacemaker, the checks of the device revealed no defects to correlate with Beavers's complaints.   (Tr. 26).   He also found Beavers's daily activities inconsistent with her allegation of disabling impairments, stating:

> She drives a car and is the primary caretaker of her child.  Driving an automobile for any distance requires sufficient concentration and mental skills to follow directions, read traffic signs, avoid routine road hazards, as well as appreciate and evaluate on-coming and same-directional traffic.  It also requires significant physical abilities such as sitting in one place for a period of time, turning the steering wheel, and maneuvering one's body in positions as to see in all directions and angles, while simultaneously operating foot controls.  Performance of such activities is one of the basis [*sic:* bases] the undersigned finds that [Beavers] is capable of performing light work.  She can dress herself, prepare limited meals, button buttons, [is] able to wear flip-flops[,] and can tie her shoes.  "We swim in parents['] pool."

Tr. 27-28).   That assessment appropriately implements regulatory guidance that an ALJ should consider the consistency of a claimant's subjective complaints with the claimant's reported daily activities, and the record supplements the ALJ's conclusion. *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating that an ALJ may consider a claimant's daily activities in evaluating the limiting effects of his impairments).

The ALJ also permissibly relied upon the lack of objective medical evidence to support the level of impairments Beavers alleged.  He stated:  "Given the allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor.  However, a review of the record revels no restrictions recommended by the treating doctor."  (Tr. 28).   Beavers asserts the ALJ incorrectly construed the record, as Dr. Calhoun submitted letters stating Beavers cannot work.   However, given that the ALJ specifically addressed Dr. Calhoun's letters later in his decision, the court finds it more

likely the ALJ referred to the lack of functional restrictions from a treating physician, not the lack of an ultimate opinion on Beavers's ability to work, which would carry limited weight in any event.  Even if the ALJ did erroneously state that the record lacked any restrictions from a treating physician, that statement constituted no more than harmless error, because the ALJ discussed Dr. Calhoun's letters later in the administrative decision.   (Tr. 29-30).

Regarding Beavers's allegations of disabling musculoskeletal pain, the ALJ also considered that her treatment records did not record any muscle atrophy, and she reported zero-level pain to her medical providers on multiple occasions.   (Tr. 28, 832, 838, 858, 863, 939, 944, 951, 957).   Regarding Beavers's complaints of anxiety, the ALJ considered that she did not receive any mental health treatment other than medication from Dr. Calhoun, that Dr. Calhoun noted improvement of her condition with medication, and that her treatment notes included normal mental health findings.   (Tr. 28).   The ALJ also found that Beavers's records from Dr. Calhoun and the Heart Center failed to support her allegations of subjective symptoms, and as previously stated, the ALJ properly considered those medical records, including Dr. Calhoun's opinions.

Beavers asserts the ALJ failed to account for her longitudinal treatment history for chronic pain, anxiety, and racing heart.   Even though Beavers consistently complained to her medical providers of symptoms resulting from those conditions,

neither the mere complaints regarding those symptoms, nor the mere fact of a physician's treatment of the symptoms, supports a finding of disability under the Social Security Act.  *See Moore,* 405 F.3d at 1213 n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)) ("To a large extent, Moore questions the ALJ's RFC determination based solely on the fact that she has varus leg instability and shoulder separation.  However, the mere existence of these impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination in that regard.").  Beavers's medical records do not document the existence of any disabling functional limitations. Such limitations, not solely her subjective reports of pain and other symptoms, constitute the relevant consideration in the Social Security disability determination.

In summary, the ALJ properly considered Beavers's complaints of subjective symptoms.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 19th day of March, 2021.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

23